UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS EUGENE CREECH,<br><br>                Petitioner,<br><br>v.<br><br>AL RAMIREZ, Warden,[1]<br><br>                Respondent. | Case No. 1:99-cv-00224-BLW<br><br>**<u>CAPITAL CASE</u>**<br><br>**MEMORANDUM DECISION AND ORDER ON REMAND** |

       Thomas Eugene Creech, the Petitioner in this federal habeas corpus action, is an Idaho state prisoner under a sentence of death. In 2006, the Court determined that a number of Creech's claims—including various claims of ineffective assistance of trial counsel—were procedurally defaulted and that Creech had not established cause and prejudice to excuse the default. (Dkt. 173, 181.) On March 31, 2010, the Court denied habeas relief on the merits of the remaining claims and entered final judgment.[2] (Dkt. 279, 280.) Having been granted a certificate of appealability on certain claims, Creech appealed to the Ninth Circuit Court of Appeals.

---

[1]     Respondent Al Ramirez is substituted for his predecessor, John Hardison, as Warden of the Idaho Maximum Security Institution. *See* Fed. R. Civ. P. 25(d).

[2]     On June 9, 2010, the Court denied Creech's motion to alter or amend the judgment, which pertained only to Claim 1. (Dkt. 283.) Claim 1 is not currently at issue.

**MEMORANDUM DECISION AND ORDER ON REMAND - 1**

Shortly after oral argument in the Ninth Circuit, the Supreme Court decided *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), which determined for the first time that ineffective assistance of postconviction review counsel ("PCR counsel") can, under certain circumstances, constitute cause to excuse the default of an underlying claim of ineffective assistance of trial counsel ("IATC").[3] The Ninth Circuit granted Creech's motion to remand for reconsideration, in light of *Martinez*, of his ineffective assistance of counsel ("IAC") claims. (Dkt. 293.) The panel instructed this Court to determine whether the *Martinez* exception applies to Creech's IAC claims that were previously determined to be procedurally defaulted. The parties have addressed the issue in supplemental briefs.

The Court has carefully considered the pleadings, briefs, and record in this case— including the state court record—and has determined that oral argument is unnecessary. *See* D. Idaho Loc. Civ. R. 9.2(h)(5) ("Motions and petitions shall be deemed submitted and shall be determined upon the pleadings, briefs, and record. The court, at its discretion, may order oral argument on any issue or claim."). Accordingly, the Court enters the following Order concluding that the exception established in *Martinez v. Ryan* does not apply to excuse the default of Creech's IATC claims.

## BACKGROUND

The parties are familiar with the factual and procedural background of Creech's conviction, as well as all state and federal court proceedings, and the Court has

---

[3]   Although the Ninth Circuit has since extended *Martinez* to underlying claims of ineffective assistance of direct appeal counsel, *Nguyen v. Curry*, 736 F.3d 1287, 1293 (9th Cir. 2013), Creech does not argue that the procedural default of any IADAC claim is excused under *Martinez*. (*See* Dkt. 308, 318.)

**MEMORANDUM DECISION AND ORDER ON REMAND - 2**

previously recounted that background in its prior orders. The Court specifically adopts, as if fully incorporated in this Memorandum Decision and Order, the factual description set forth in its March 31, 2010 decision denying habeas relief. (*See* Dkt. 279.) The underlying facts of Creech's crime and the course of the judicial proceedings will be recited here only for context and as necessary to explain the Court's decision.

Creech was serving two Idaho life sentences for murder—having had his previous death sentence vacated—when, on May 13, 1981, he brutally murdered fellow prisoner David Jensen. Jensen was partially disabled; part of his brain had been removed and, as a result, Jensen had a plastic plate in his skull. After an altercation between the two inmates, Creech beat Jensen with a battery-filled sock. After Jensen was incapacitated by this first salvo, completely helpless and with his skull plate shattered, Creech stomped repeatedly on Jensen's neck and head. (*Id*. at 2-3.)

Jensen had been seen as a troublemaker and had previously antagonized Creech, for example, by spilling syrup on a floor that Creech had just cleaned. Initially it could have appeared that Jensen had instigated the altercation, though Creech later admitted that he had planned to kill Jensen. The sentencing court found the following facts, which are presumed correct under 28 U.S.C. § 2254(e)(1):

> [T]he murder which occurred on "B" tier in the penitentiary was planned and executed by Tom Creech to kill David Jensen. All the weapons which were used in this murder were made by Tom Creech. Jensen was egged on to attack Creech so the justification of self-defense could be used. Jensen had earlier suffered a head injury resulting in a plastic plate covering part of his skull and limited coordination. Tom Creech referred to him as "spastic."

**MEMORANDUM DECISION AND ORDER ON REMAND - 3**

Creech was the janitor for "B" tier and the only inmate who could be out simultaneously with another inmate. On May 13th, Jensen was released from his cell for his hour of exercise and shower. Jensen approached Creech holding a weapon made up of batteries in a sock. The sock was later determined to be Creech's. Words were exchanged and Jensen swung the weapon at Creech. Creech was not in fear of his life; he merely took the weapon and punched Jensen in the face. Jensen retreated.

Creech went to his cell and made a second weapon out of a toothbrush, razor blade, and wire. He took this weapon to a second inmate who in turn gave it to Jensen and urged a second attack. Jensen came out of his cell and again swung at Creech causing slight cuts. Creech went to his own cell and brought out a radio, plugged it in near Jensen's cell and turned it on loud. Creech went into Jensen's cell and began beating him with the battery-filled sock.

Creech took breaks during the beating. At one time he believed that he had mortally injured Jensen but yet returned to the cell where Jensen lay helpless and sprawled on the floor[,] and [Creech] proceeded to beat [Jensen] with his hands, kicking him several times in the throat. Ultimately Jensen died on the operating table. The pathologist report determined that David Jensen's death resulted from the shattering of his skull bone and plate. Thomas Eugene Creech did deliberately and with premeditation kill David Jensen....

(State's Lodging H-35 at 264-66.)

At the time Creech murdered Jensen, Creech had previously been convicted of four other murders—two in Idaho and two in Oregon. But, as the Supreme Court noted in 1993, Creech "has admitted to killing or participating in the killing of at least 26 people. The bodies of 11 of his victims—who were shot, stabbed, beaten, or strangled to death—

**MEMORANDUM DECISION AND ORDER ON REMAND - 4**

have been recovered in seven States.[4] Creech has said repeatedly that, unless he is completely isolated from humanity, he likely will continue killing." *Arave v. Creech*, 507 U.S. 463, 465-66 (1993).

Creech was charged with first-degree murder and represented by Rolf Kehne, an attorney with the Ada County Public Defender's Office. Creech pleaded guilty to Jensen's murder—against Kehne's advice—and was sentenced to death by the judge after a sentencing hearing ("the 1982 sentencing").[5] This Court denied relief on Creech's first federal habeas petition, filed in 1986. On appeal, the Ninth Circuit found several constitutional problems with Creech's death sentence. Although the United States Supreme Court granted review on one of those issues and ruled in favor of the state, the case was remanded for resentencing because of the other errors identified by the Ninth Circuit. (Dkt. 279 at 4-5.)

The state trial court held a new sentencing hearing in 1995 ("the 1995 resentencing"), at which Creech was represented by Kehne—who was then in private practice—and Kehne's law partner, John Adams. The witnesses who testified for the defense were Creech's sister, his brother-in-law, and a mental health expert. These witnesses provided evidence that Creech was "verbally and physically abused," that

---

[4]    The true number of Creech's murder victims will likely never be known. Creech himself stated to the sentencing court on March 27, 1995, that although he had previously confessed to killing 42 people, he did not actually kill that many. (State's Lodging H-36 at 419.) What remains undisputed after almost 35 years is that Creech has been convicted of 5 murders, has almost certainly committed at least several more, and was serving a life sentence at the time he killed Jensen.

[5]    The trial court initially sentenced Creech to death by written order, but the Idaho Supreme Court remanded for the pronouncement of sentence in Creech's presence. The judge then read the earlier sentence into the record, with Creech present, without taking new evidence.

**MEMORANDUM DECISION AND ORDER ON REMAND - 5**

Creech suffered a serious head injury as a child as a result of falling down the stairs, that two of Creech's brothers were also incarcerated for homicide, that Creech was a talented artist and poet, that Creech had been calmed by his relationship with his new wife, and that Creech "probably had a genetic or biological predisposition for violence." (*Id.* at 23-24.)

After the resentencing hearing, the judge found five statutory aggravating factors: (1) Creech had been convicted of prior murders; (2) Creech's murder of Jensen exhibited utter disregard for human life; (3) Creech was under a prison sentence for first-degree murder when he killed Jensen; (4) Creech murdered another inmate with specific intent; and (5) Creech exhibited a propensity to commit murder that would likely constitute a continuing threat to society. (*Id.* at 6.) The judge considered various mitigating factors, including that (1) Creech was aging, (2) had completed his GED while serving in the army, (3) had cooperated with law enforcement in the past, (4) was creative, (5) had credited his wife for reduced disciplinary infractions, and (6) might have a biological component making him predisposed to violence. (*Id.*; State's Lodging H-35 at 263-64.)

Having weighed the aggravating and mitigating factors, the judge again imposed the death penalty:

> Thomas Eugene Creech murdered David Jensen while they were both inmates at the Idaho State Corrections Institute. The arguments presented at the earlier hearing that it was somehow the prison officials' fault for putting Jensen in the tier with killers; that Creech was angry because Jensen spilled syrup on the floor that Creech had just cleaned; or that Jensen was an obnoxious punk who was going to be hurt by someone on that tier do not come close to justifying this

**MEMORANDUM DECISION AND ORDER ON REMAND - 6**

> murder. *Tom Creech kills almost on whims with little regard or interest in the consequences. He may "feel bad" at times about some of these murders, but he has no control or chooses not to exercise control over his actions. The protection of society demands that Thomas Eugene Creech receive the Death Penalty.*

(State's Lodging H-35 at 268-69 (emphasis added).) Creech's sentence was upheld on appeal.

With the assistance of counsel, Creech filed a petition for state postconviction relief. Creech was assigned a new attorney from the Ada County Public Defender's Office, August Cahill, who amended and supplemented the petition. The petition asserted, among other things, that Creech's trial counsel rendered ineffective assistance by failing to adequately develop and present evidence of mitigation for purposes of sentencing. (State's Lodging I-38 at 81-82.)

Cahill requested and was granted numerous continuances. The evidentiary hearing on Petitioner's postconviction petition was not held until over sixteen months after Cahill's appointment. Creech's witnesses at the hearing provided evidence that, among other things, Creech had been sexually abused as a child and Creech's daughter had been hospitalized several times for mental illness. (Dkt. 279 at 25.) Several witnesses suggested that Creech's trial attorneys had been ineffective at the 1995 resentencing proceeding, including Kehne and Adams themselves.

After denying Creech's request to continue the evidentiary hearing to gather more evidence, the state district court denied postconviction relief. (*Id.* at 26; State's Lodging I-38 at 191-217.) As to Creech's mitigation-based IAC claims, the court concluded that,

**MEMORANDUM DECISION AND ORDER ON REMAND - 7**

even assuming the truth of the evidence presented at the postconviction hearing, the court still would have imposed the death penalty, and, therefore, Creech had not established a reasonable probability that he was prejudiced by trial counsel's performance:

> Accepting for purposes of this decision the testimony elicited at the post-conviction relief hearing as to what evidence Kehne could have or should have secured to give as many mitigating factors as possible, *this court's firm belief is that the outcome of the sentencing would not have changed*. This court's interest was (1) whether Creech had killed Jensen; (2) was Creech predisposed to take human life and (3) was he incapable of comprehending the outcome of his actions. The childhood history of Creech was incidental to this court; *the possibility of a biological predisposition was listed as a mitigating factor by this court*; and the suggestion that the victim was a punk was also listed. However, *when it is all said and done this court determined that Thomas Eugene Creech was an adult male of at least normal intelligence who was able to comprehend the results of his actions and did with specific intent kill another inmate while imprisoned as a result of an earlier conviction*. The second prong of the ineffective assistance test has not been met.

(State's Lodging I-38 at 209-10 (emphasis added).)

In 1999, Creech filed this habeas petition, which was stayed for a time while he exhausted additional claims in state court. Creech obtained no relief in state court. This case was reopened, and Creech filed a Second Amended Petition asserting 45 claims. (Dkt. 131.) The Second Amended Petition contains over 60 IAC sub-claims. The Court determined that most of those IAC sub-claims, as well as a conflict of interest claim initially asserted in a successive state postconviction petition, were procedurally defaulted. (Dkt. 173 at 13-14, 21.) The Court later concluded that Creech had not shown cause and prejudice to excuse the default of those claims. The governing law with respect

**MEMORANDUM DECISION AND ORDER ON REMAND - 8**

to postconviction counsel's representation was, at that time, set forth in *Coleman v. Thompson*, 501 U.S. 722 (1991). Therefore, ineffective assistance of PCR counsel was not available to Creech as potential cause to excuse the default of his IATC and conflict of interest claims.

Because *Martinez v. Ryan* has established an equitable exception to the *Coleman* rule that applies, under certain circumstances, to IAC and conflict of interest claims, the Court now considers whether some of Creech's habeas claims may be excused from procedural default pursuant to that exception.

## DISCUSSION

### 1.    Summary of IATC Claims at Issue

Creech initially asserts that eighteen of his IATC sub-claims should be heard (or re-heard) on the merits based on the *Martinez* exception. (Pet. Suppl. Op. Brief re: *Martinez*, Dkt. 308, at 3, identifying Claim 4, ¶¶ 99(h) & (j); Claim 4, ¶¶ 100(a), (b), (d), (e), (g), (h), (*i*), (j), (m), (*o*)(i), (*o*)(ii), (*o*)(iii), (*o*)(iv), (*o*)(v) & (q); and Claim 30 as subject to *Martinez*.) However, Creech's Supplemental Opening Brief provides specific argument on only six sub-claims: those set forth in ¶¶ 100(a), (b), (d), (j), (*o*)(iii), and (*o*)(iv) of Claim 4.[6]

---

[6]      Unfortunately, aside from the bare identification of the claims that Creech contends are subject to *Martinez* (*see* Dkt. 308 at 3), Creech's briefing does not identify by number the particular IATC claims that he specifically addresses and supports with argument. The Court was thus required to comb through Creech's supplemental briefs numerous times at length and compare them with his Second Amended Petition, to determine which claims Creech had actually placed at issue on remand.

**MEMORANDUM DECISION AND ORDER ON REMAND - 9**

### A.     *Claims Specifically Supported with Argument in Creech's* **Martinez** **Briefing**

One of the IAC sub-claims that Creech squarely puts at issue in his *Martinez*

briefing was previously determined by this Court to be procedurally defaulted:

> Claim 4, ¶ 100(a):          Failure to prepare, develop, and present a
> coherent sentencing strategy.

(Dkt. 308; *see also* Dkt. 131 at 24.)

The other five claims that Creech supports with specific argument regarding

*Martinez* were denied on the merits by the Idaho Supreme Court and by this Court.

Creech asserts that these claims—all of which are mitigation-based IAC claims—were

adjudicated on an inadequate record due to PCR counsel's ineffectiveness and, therefore,

should be re-heard on the merits on an expanded record pursuant to the *Martinez*

exception:

> Claim 4, ¶ 100(b):          Failure to conduct an adequate and independent
> investigation of matters in mitigation, including
> but not limited to family interviews presenting
> significant genetic history of mental illness, that
> Creech was raised by a mentally ill parent,
> history of serious head injuries,
> institutionalization, and Creech's prior
> psychotic experiences.
>
> Claim 4, ¶ 100(d):          Failure to timely retain qualified mental health
> experts to address the issues of mental health
> clearly apparent in Creech's case, including
> organic brain damage, psychosis or mental
> impairment, which allegedly rendered Creech
> unable to make rational decisions and impaired
> his judgment and ability to respond rationally to
> perceived circumstances and conform his
> conduct to requirements of law.

**MEMORANDUM DECISION AND ORDER ON REMAND - 10**

| | |
|---|---|
| Claim 4, ¶ 100(j): | Failure to retain qualified mental health experts to investigate and assist in the investigation and development of mitigation evidence to include mental health issues, including the extent and effect of known and unknown head injuries. |
| Claim 4, ¶ 100(*o*)(iii): | Failure to present relevant mitigating evidence with respect to Creech's daughter, whose mental condition would support claims of organic causes for the aggressive behavior identified in Creech. |
| Claim 4, ¶100(o)(iv): | Failure to present relevant mitigating evidence with respect to Creech's mother, who suffered from crippling mental illness and whose mental illness impaired her ability to adequately parent, and with whom Creech was especially close while growing up. |

(Dkt. 308; *see also* Dkt. 131 at 24-27; Dkt. 279.)

### B.   *Claims with Forfeited or Waived* **Martinez** *Arguments*

The remaining sub-claims that Creech nominally asserts are subject to *Martinez* are not addressed in any specific way in Creech's supplemental briefing. These include the following claims of ineffective assistance of trial counsel with respect to the guilt phase:

| | |
|---|---|
| Claim 4, ¶ 99(h): | Failure to investigate and present evidence of the assaultive history of acts by the victim, which would have corroborated Creech's belief that he acted in self-defense; and |
| Claim 4, ¶ 99(j): | Failure to secure adequate testing concerning the brain damage that could have affected Creech's ability to control his behavior and thus undermines the finding of Creech's guilty plea and raise issues of mitigation. |

(Dkt. 308; *see also* Dkt. 131 at 23-24.)

**MEMORANDUM DECISION AND ORDER ON REMAND - 11**

The IATC claims that Creech fails to support with specific argument and evidence also include the following claims of ineffective assistance during the 1995 resentencing proceedings:

Claim 4, ¶ 100(e):     Failure to investigate and present defenses and mitigating circumstances surrounding uncharged criminal activity presented at sentencing, including propensity to confess to homicides and offenses not committed by Creech;

Claim 4, ¶ 100(g):     Failure to investigate, develop and present evidence rebutting aggravating evidence considered by the trial court, including evidence regarding Mr. Creech's standing within the prison community;

Claim 4, ¶ 100(h):     Waiver of Creech's right to Fourth, Fifth, Sixth and Fourteenth Amendment protection and evidentiary privileges for "all past and future" psychological testing and interviews, effectively permitting evidence, advice, consultation and privileged information to be used in aggravation;

Claim 4, ¶ 100(*i*):     Failure to investigate and present evidence in mitigation regarding cultural behavior patterns relating to Creech's childhood and incarceration;

Claim 4, ¶ 100(m):     Failure to research Eighth Amendment jurisprudence as it applies to the preparation and presentation of evidence in mitigation;

Claim 4, ¶ 100(*o*)(i):     Failure to present relevant mitigating evidence with respect to an incident where Creech saved the life of another person;

Claim 4, ¶ 100(*o*)(ii):     Failure to present relevant mitigating evidence with respect to Creech's attempt to get help for Jensen;

Claim 4, ¶ 100(*o*)(v):     Failure to present relevant mitigating evidence with respect to participation, facilitation, solicitation by, and

**MEMORANDUM DECISION AND ORDER ON REMAND - 12**

Claim 4, ¶ 100(q):

consent to the offense or circumstances which led to the Jensen's death, by Department of Correction employees, as well as by other inmates, including but not limited to Walter Balla and David Jensen himself; and

Failure to present sufficiently developed and supported evidence of mental health issues, including personality disorder diagnoses not accepted in the scientific or medical community and appropriate only in aggravation, not mitigation of sentence.

(Pet. Suppl. Op. Brief re: *Martinez*, Dkt. 308; Sec. Am. Pet., Dkt. 131.)

Finally, Creech does not provide any specific *Martinez* argument with respect to Claim 30, which asserts that his trial counsel labored under a conflict of interest.[7] (Pet. Suppl. Op. Brief re: *Martinez*, Dkt. 308; Sec. Am. Pet., Dkt. 131.)

Because Creech offers no particular argument or evidentiary support for these twelve claims—eleven traditional IATC claims and one conflict of interest claim—the Court finds that Creech's *Martinez* arguments regarding these claims have been either forfeited or voluntarily waived.[8] *See Fields v. Blades*, Case No. 1:95-cv-00422-BLW (Dkt. 318), 2015 WL 1481397, at *12 (March 31, 2015) (footnote omitted) (unpublished) ("[T]he only IATC sub-claims that Petitioner specifically supports with argument regarding *Martinez* are [eleven specific claims]. Therefore, the Court will address only

---

[7]     The Ninth Circuit has held that *Martinez* can apply not only to traditional, *Strickland*-type IAC claims, but also to claims, based on *Cuyler v. Sullivan*, 446 U.S. 335 (1980), that counsel labored under a conflict of interest. *See Pizzuto v. Ramirez*, 783 F.3d 1171, 1178 (9th Cir. 2015).

[8]     Consideration of the merits of Claim 4, ¶¶ 99(h) and (j) is barred for the additional reason that those sub-claims are subject to the successive petitions bar. *See* 28 U.S.C. § 2244(b). As the Court previously determined, Petitioner is barred from asserting any guilt phase claims in this habeas matter, because he had a full and fair opportunity to challenge the validity of his conviction in his first habeas corpus action. (Dkt. 279 at 10-13; *see also Creech v. Arave*, Case No. CV-86-1042-HLR.)

**MEMORANDUM DECISION AND ORDER ON REMAND - 13**

those eleven IATC claims."); *FDIC v. Garner*, 126 F.3d 1138, 1145 (9th Cir. 1997)

("Appellants present no case law or argument in support of this claim. Accordingly, we

deem the argument waived."); *see also United States v. Perez*, 116 F.3d 840, 845 (9th

Cir. 1997) (9th Cir. 1997) (distinguishing between the concepts of forfeiture and waiver).

Thus, the only claims currently at issue with respect to the *Martinez* exception are

the following: subparagraphs 100(a), 100(b), 100(d), 100(j), 100(*o*)(iii), and 100(*o*)(iv) of

Claim 4.

**2.      Standard of Law for Procedural Default and Cause and Prejudice under**
**        *Martinez v. Ryan***

A habeas petitioner must exhaust his or her remedies in the state courts before a

federal court can grant relief on constitutional claims. *O'Sullivan v. Boerckel*, 526 U.S.

838, 842 (1999). To do so, the petitioner must invoke "one complete round of the State's

established appellate review process," fairly presenting all constitutional claims to the

state courts so that they have a full and fair opportunity to correct alleged constitutional

errors at each level of appellate review. *Id.* at 845.

When a habeas petitioner has not fairly presented a constitutional claim to the

highest state court, and it is clear that the state court would now refuse to consider it

because of the state's procedural rules, the claim is said to be procedurally defaulted.

*Gray v. Netherland*, 518 U.S. 152, 161-62 (1996). If a petitioner's claim is procedurally

defaulted, a federal district court generally cannot hear the merits of the claim. However,

if a petitioner shows adequate legal cause for the default and prejudice arising from the

default, the federal court may address the claim on the merits. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

To show "cause" for a procedural default, a petitioner must ordinarily demonstrate that some objective factor external to the defense impeded his or his counsel's efforts to comply with the state procedural rule at issue. *Id.* To show "prejudice," a petitioner generally bears "the burden of showing, not merely that the errors [in his proceeding] constituted a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *United States v. Frady*, 456 U.S. 152, 170 (1982).

A petitioner does not have a federal constitutional right to the effective assistance of counsel during state postconviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 554 (1987); *Bonin v. Vasquez*, 999 F.2d 425, 430 (9th Cir. 1993). As a result, the general rule is that any errors of counsel during a postconviction action cannot serve as a basis for cause to excuse a procedural default. *Coleman*, 501 U.S. at 752.

*Martinez v. Ryan* worked a "remarkable" change in the law governing procedurally defaulted IAC claims. *Lopez v Ryan*, 678 F.3d 1131, 1136 (9th Cir. 2012). *Martinez* altered the long-standing rule that postconviction counsel's ineffectiveness could not be used to excuse the procedural default of a habeas claim. In effect, *Martinez* created the potential for an exception to the overall ban on new evidence in § 2254 actions that was pronounced in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011) (interpreting the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)). *Martinez* makes it

**MEMORANDUM DECISION AND ORDER ON REMAND - 15**

possible for procedurally defaulted ineffective assistance of trial counsel claims to be heard de novo, with new supporting evidence, on federal habeas corpus review. *See Dickens v. Ryan*, 740 F.3d 1302, 1320 (9th Cir. 2014) (en banc) ("We reject any argument that *Pinholster* bars the federal district court's ability to consider Dickens's 'new' IAC claim. . . . *Pinholster* says nothing about whether a court may consider a 'new' claim, based on 'new' evidence not previously presented to the state courts."). The *Martinez* exception applies only to claims that are both exhausted and procedurally defaulted.

In *Trevino v. Thaler*, the Supreme Court described and clarified the *Martinez* cause and prejudice test as consisting of four necessary prongs: (1) the underlying claim of ineffective assistance of counsel must be a "substantial" claim; (2) the "cause" for the procedural default consists of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" collateral review proceeding where the IAC claim could have been brought; and (4) state law requires that an IAC claim be raised in an initial-review collateral proceeding rather than on direct appeal, or by "design and operation" such claims must be raised that way. 133 S. Ct. 1911, 1918, 1921 (2013).

The failure to meet any one of these four prongs means that the *Martinez* exception is unavailable to excuse the procedural default of the underlying IAC claim. *See Martinez*, 132 S. Ct. at 1319.

**MEMORANDUM DECISION AND ORDER ON REMAND - 16**

**A.       First Prong of Martinez: *Substantiality of Underlying IAC Claim***

Under the first prong of a *Martinez* analysis, a petitioner must bring forward facts

demonstrating that his IAC claim is substantial. The United States Supreme Court has

defined "substantial" as a claim that "has some merit." *Martinez*, 132 S. Ct. at 1318

(comparing the standard for certificates of appealability from *Miller-El v. Cockrell*, 537

U.S. 322 (2003)). Stated inversely, a claim is "*in*substantial" if "it does not have any

merit or . . . is wholly without factual support." *Id.* at 1319.

Determining whether an IAC claim is substantial requires a federal court to

examine the claim under *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner

asserting ineffective assistance of counsel under *Strickland* must show that (1) "counsel

made errors so serious that counsel was not functioning as the 'counsel' guaranteed the

defendant by the Sixth Amendment," and (2) counsel's errors "deprive[d] the defendant

of a fair trial, a trial whose result is reliable." *Id*. at 687.

Under the first *Strickland* prong, whether an attorney's performance was deficient

is judged against an objective standard of reasonableness. *Id.* at 687-88. A reviewing

court's inquiry into the reasonableness of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be
> highly deferential. It is all too tempting for a defendant to
> second-guess counsel's assistance after conviction or adverse
> sentence, and it is all too easy for a court, examining
> counsel's defense after it has proved unsuccessful, to
> conclude that a particular act or omission of counsel was
> unreasonable. A fair assessment of attorney performance
> requires that every effort be made to eliminate the distorting
> effects of hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the conduct

**MEMORANDUM DECISION AND ORDER ON REMAND - 17**

> from counsel's perspective at the time. Because of the
> difficulties inherent in making the evaluation, a court must
> indulge a strong presumption that counsel's conduct falls
> within the wide range of reasonable professional assistance;
> that is, the defendant must overcome the presumption that,
> under the circumstances, the challenged action might be
> considered sound trial strategy. There are countless ways to
> provide effective assistance in any given case. Even the best
> criminal defense attorneys would not defend a particular
> client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

Strategic decisions, such as the choice of a defense or which witnesses or other evidence to present, "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Id.* at 690. Moreover, an attorney who decides not to investigate a particular theory or issue in the case is not ineffective so long as the decision to forego investigation is itself objectively reasonable. *Id.* at 690-91.

If a petitioner shows that counsel's performance was deficient, the next step in the *Strickland* inquiry is the prejudice analysis. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To satisfy the prejudice standard, a petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is defined as a "probability sufficient to undermine confidence in the outcome." *Id.*

These standards from *Strickland* for determining deficient performance and prejudice are, of course, the standards for an eventual review of the merits of the

**MEMORANDUM DECISION AND ORDER ON REMAND - 18**

underlying IAC claim. The first *Martinez* prong is not the same as a merits review, but, as the *Martinez* Court explained, it is more akin to a preliminary review of a *Strickland* claim for purposes of determining whether a certificate of appealability should issue. *Martinez*, 132 S. Ct. at 1318-19 (comparing *Miller-El*, 537 U.S. 322). Under this standard, a court may conclude that a claim is substantial when a petitioner has shown that resolution of the merits of the *Strickland* claim would be "debatable among jurists of reason," or that the issues presented are "adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336.

### B.    *Second Prong of* **Martinez:** *Ineffective Assistance of PCR Counsel*

Second, to be entitled to application of the *Martinez* exception, a petitioner must demonstrate that he had no counsel on initial postconviction review, or that PCR counsel was "ineffective under the standards of *Strickland*," which includes showing both deficient performance and a reasonable probability of prejudice caused by that performance. *Martinez*, 132 S. Ct. at 1318; *Strickland,* 466 U.S. at 694, 700.

#### i.    Deficient Performance of PCR Counsel

Not just any error or omission of PCR counsel will be deemed "deficient performance" that will satisfy *Martinez.* If the PCR "attorney in the initial-review collateral proceeding did not perform below constitutional standards," the PCR attorney's performance does not constitute "cause." *Martinez*, 132 S. Ct. at 1319. The *Strickland* standards for analyzing deficient performance set forth above apply with equal force to PCR counsel in the context of a *Martinez* argument. Importantly, PCR counsel "is not necessarily ineffective for failing to raise even a nonfrivolous claim." *Sexton v. Cozner*,

**MEMORANDUM DECISION AND ORDER ON REMAND - 19**

679 F.3d 1150, 1157 (9th Cir. 2012). If PCR counsel's performance was deficient, then the court must consider whether that performance was prejudicial under *Strickland*. *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014) (petition for reh'g and reh'g en banc pending), *called into question on other grounds by McKinney v. Ryan*, ___ F.3d ___, 2015 WL 9466506 (9th Cir. Dec. 29, 2015) (en banc).

     ii.      <u>Prejudice from PCR Counsel's Performance</u>

As to prejudice, the petitioner must show a reasonable probability that, had PCR counsel not performed deficiently, the result of the postconviction proceedings would have been different. *Id.* (cumulating and discussing all opinions from *Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013)). This prejudice determination "is necessarily connected to the strength of the [underlying] argument that trial counsel's assistance was ineffective." *Id.*

Therefore, even if Creech were to show, under the first *Martinez* prong, that his IATC claims are substantial, he must still show, under the second *Martinez* prong, that postconviction counsel rendered deficient performance *and* that, "but for post-conviction counsel's failure to raise [the substantial IAC] claims, there is a reasonable probability that the result of the post-conviction proceeding would have been different." *Id.* at 378. These two inquiries will, at times, collapse into one. *Id.* at 382 ("Under the circumstances of this case, if [the petitioner] succeeds in demonstrating that he was prejudiced by the failure of his post-conviction counsel, he will necessarily have established that there is at least 'some merit' to his claim that he suffered ineffective assistance of trial counsel at resentencing."). The Court may address either inquiry first, and the resolution of one

**MEMORANDUM DECISION AND ORDER ON REMAND - 20**

prong may obviate the need to address the other. *Martinez*, 132 S. Ct. at 1319 ("When faced with the question whether there is cause for an apparent default, a State may answer that the ineffective-assistance-of-trial-counsel claim is insubstantial, *i.e.*, it does not have any merit or that it is wholly without factual support, or that the attorney in the initial-review collateral proceeding did not perform below constitutional standards.").

### C.     Third Prong of **Martinez**: *Initial State Collateral Review Proceeding*

The third prong of the *Martinez* test is that the state collateral review proceeding in which the underlying IAC claim was defaulted must have been the first post-conviction review proceeding where the IAC claim could have been raised. *Trevino*, 133 S. Ct. at 1918. In other words, the post-conviction proceeding must have been "the equivalent of a prisoner's direct appeal" for the IAC claim. *Martinez*, 132 S. Ct. at 1317. A petitioner may not use as cause attorney error that occurred in "appeals from initial-review collateral proceedings, second or successive collateral proceedings, [or] petitions for discretionary review in a State's appellate courts." *Id.* at 1320.

### D.     Fourth Prong of **Martinez**: *State Law Treatment of IAC Claims*

The fourth prong of the *Martinez* test is that state law must require (by law or by reason of design and operation) that an ineffective assistance of trial counsel or appellate counsel claim be raised in an initial-review collateral proceeding. *Trevino*, 133 S. Ct. at 1918, 1921.The parties do not dispute that, in Idaho, IAC claims must generally be raised in a postconviction petition rather than on direct appeal.

3.    *Martinez* **Analysis of the IATC Sub-Claims presented in Claim 4, ¶¶ 100(a), (b), (d), (j), (*o*)(iii), and (*o*)(iv) of the Second Amended Petition**

Creech argues that some of his procedurally-defaulted ineffective assistance of counsel claims may properly be heard (or reheard with additional evidence) on the merits pursuant to *Martinez v. Ryan.* If necessary, a court should hold an evidentiary hearing to determine the applicability of the *Martinez* exception. *See Detrich*, 740 F.3d at 1246-47 (plurality). However, "[a]n evidentiary hearing is not necessary to allow a petitioner to show cause and prejudice if the court determines as a matter of law that he cannot satisfy the standard." *Clark v. Lewis*, 1 F.3d 814, 820 (9th Cir. 1993).

As explained below, Creech cannot, as a matter of law, satisfy the *Martinez* standard for cause and prejudice as to Claim 4, ¶ 100(a). Further, the Court determines that *Martinez* does not apply to Claim 4, ¶¶ 100(b), (d), (j), (*o*)(iii), or (*o*)(iv), because those claims are not fundamentally altered from the claims decided on the merits by the Idaho Supreme Court and, therefore, are not procedurally defaulted. For these reasons, the Court will deny Creech's request for an evidentiary hearing on the *Martinez* issue.

A.    *Claim 4, ¶ 100(a): The IATC Claim That this Court Determined to Be Procedurally Defaulted and Did Not Consider on the Merits*

In Claim 4, ¶ 100(a), Creech asserts that trial counsel failed to prepare, develop, and present a coherent strategy. As described in Creech's Supplemental Opening Brief, trial counsel allegedly "did not pursue a sentencing presentation based upon reasoned strategic judgment," but, instead, "pursued a course that was based on inattention to the evidence in his possession." (Dkt. 308 at 10.) Creech claims that (1) trial counsel "failed

to bring professional skill and knowledge to the proceedings, resulting in the absence of a reliable adversarial proceeding," and (2) trial counsel's sentencing "was a disjointed presentation of random reminiscences and unsupported psychological theories." (*Id.*) The Court previously determined that this claim was procedurally defaulted.

It is important to note the difference between the claim in ¶ 100(a), which attacks trial counsel's *strategy* in presenting mitigating evidence, and the claims in ¶¶ 100(b), (d), (j), (*o*)(iii), and (*o*)(iv), which attack counsel's failure to adequately investigate and present mitigating evidence. The former claim challenges the way in which counsel presented the mitigating evidence that they offered at resentencing, while the latter claims challenge the failure to gather different or additional mitigating evidence to present at resentencing.

At issue with respect to Claim 4, ¶ 100(a) are the first two prongs of the *Martinez* cause-and-prejudice test: (1) whether this sentencing-strategy IATC claim is substantial; and (2) whether Creech's PCR counsel rendered ineffective assistance in failing to raise this claim.

After carefully considering the entire record, the Court concludes that Creech has not satisfied the second prong of *Martinez* with respect to his sentencing-strategy IATC claim. PCR counsel did not perform deficiently by pursuing other IAC claims instead of ¶ 100(a), and—even if PCR counsel was deficient—Creech cannot establish a reasonable probability that he was prejudiced by PCR counsel's failure to pursue this claim.

**MEMORANDUM DECISION AND ORDER ON REMAND - 23**

Therefore, Creech's PCR counsel did not render ineffective assistance by failing to pursue Claim 4, ¶ 100(a).

i.   Standard of law used in evaluating PCR counsel's performance under *Martinez*

The parties disagree over the standard to be applied in evaluating PCR counsel's effectiveness for purposes of a *Martinez* analysis. Precisely how to determine whether PCR counsel's performance was deficient is an open question, but it is informed by the standards applicable in evaluating attorney performance in the context of claims of ineffective assistance of trial and direct appeal counsel.

As to the deficient performance prong of the *Strickland* test for PCR counsel, the state argues that the Court should use the same standard that courts apply when considering claims of ineffective assistance of direct appeal counsel ("IADAC"). (Dkt. 315 at 35-36.) In *Jones v. Barnes*, the Supreme Court held that direct appeal counsel need not "press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." 463 U.S. 745, 751 (1983). The Court recognized that "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Id.* at 751-52. It is generally very difficult for a petitioner to prevail on an IADAC claim because the review of direct appeal counsel's performance is extremely deferential.

The application of a similar standard in the context of PCR counsel's performance is supported by the Ninth Circuit's statement in *Sexton* that PCR counsel "is not

necessarily ineffective for failing to raise even a nonfrivolous claim." 679 F.3d at 1152.

Because PCR counsel, like direct appeal counsel, must make tactical decisions as to

which errors to challenge, the state contends that it should be just as difficult to establish

the deficient performance prong with respect to a claim of ineffective assistance of PCR

counsel as it is to do so with respect to a claim of deficient performance of direct appeal

counsel.

Creech contends, on the other hand, that the standard applicable to the question of

deficient performance of PCR counsel should be less stringent than that applied to

IADAC claims because "collateral counsel does not function in the same manner as

appellate counsel." (Dkt. 318 at 6.) PCR counsel must function as an investigator and

seek out facts to support the petitioner's postconviction claims, rather than relying only

on the trial record as direct appeal counsel does. In this respect, PCR counsel is in a

similar position to trial counsel, who must independently investigate the facts and

develop a defense strategy. Creech thus appears to contend that the Court should evaluate

PCR counsel's performance by the same standards as the performance of trial counsel in

an IATC claim.

Both parties make salient points. Because PCR counsel's role is to expand the

record through investigation rather than rely solely on the existing trial record, the

standard applicable to PCR counsel's performance should be easier for a petitioner to

satisfy than the standard applicable to direct appeal counsel's performance. However,

because PCR counsel takes on a case after it has already become final and must make

**MEMORANDUM DECISION AND ORDER ON REMAND - 25**

reasoned judgments about which claims of trial error have a greater degree of potential

success on postconviction review, PCR counsel should also not be judged against exactly

the same deficient-performance standard as trial counsel. Therefore, the Court has

determined that, in undertaking the *Strickland* analysis when evaluating PCR counsel's

performance under *Martinez*, a federal court's review must be *more* deferential than that

afforded trial counsel, but *less* deferential than that afforded direct appeal counsel.

Ultimately, the Court need not define this standard more precisely. The Court

concludes as a matter of law that, under any attorney performance standard, PCR counsel

acted reasonably in choosing not to pursue Claim 4, ¶ 100(a) in Creech's initial-review

postconviction proceedings. Further, even if the Court were to assume that PCR counsel

performed deficiently in failing to pursue ¶ 100(a), Creech cannot demonstrate a

reasonable probability that he was prejudiced by PCR counsel's performance.[9]

---

[9] Creech's briefing, filed before the Ninth Circuit decided *Clabourne*, focuses primarily on the first prong of *Martinez* (substantiality) and the deficient performance aspect of the second *Martinez* prong, largely to the exclusion of the question whether PCR counsel's representation during the initial review collateral proceeding resulted in prejudice. Creech acknowledges this and contends that, "[u]nder *Martinez*, prejudice at the collateral proceeding, at the most, requires only a showing of a defaulted claim of substantial trial IAC." (Dkt. 318 at 7.)

As the circuit has clarified, however, that is an incorrect statement of law. To invoke *Martinez*, a petitioner must establish *both* substantiality of the underlying IATC claim *and* ineffective assistance of PCR counsel, which includes *Strickland* prejudice. *Clabourne*, 745 F.3d at 376-77. Indeed, the Supreme Court was careful to state that the *Martinez* exception requires the petitioner to show that PCR counsel was "ineffective *under the standards of Strickland*." *Martinez*, 132 S. Ct. at 1318. Although Creech states that his interpretation of the PCR prejudice prong is based on the confluence of the different opinions in *Detrich v. Ryan*, this proposed synthesis of the *Detrich* opinions is erroneous, as *Clabourne* later concluded. Neither party requested leave to supplement his *Martinez* briefing after *Clabourne* was decided.

**MEMORANDUM DECISION AND ORDER ON REMAND - 26**

ii.    <u>Creech has not demonstrated that his PCR counsel performed deficiently in pursuing other, mitigation-based sentencing IAC claims instead of Claim 4, ¶ 100(a), nor has Creech established a reasonable probability that the failure to present ¶ 100(a) to the PCR court resulted in *Strickland* prejudice</u>

Again, the *Martinez* exception applies to a substantial IAC claim if (1) PCR counsel provided deficient performance, and (2) there is a reasonable probability that, had PCR counsel performed adequately, the outcome of the postconviction proceeding would have been different—*i.e.*, Creech's death sentence would have been vacated and he would have been granted another resentencing hearing. *See Clabourne*, 745 F.3d at 376-77; *Strickland*, 466 U.S. at 694.

Claim 4, subparagraph 100(a) asserts that Creech's counsel's strategy at the 1995 resentencing was "based on inattention to the evidence in his possession." (Dkt. 308 at 10.) Creech argues that trial counsel should have presented the mitigating evidence in the defense's possession in a coherent manner, rather than as "a disjointed presentation of random reminiscences and unsupported psychological theories." (*Id.*)

However, generally speaking, "only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (quoting *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir. 1986)). Subparagraph 100(a) challenges a strategic decision of counsel as to how to present mitigating evidence. For this claim to succeed, Creech would have to show that, even though counsel *presented* certain mitigating evidence, counsel did so in a deficient manner. As *Strickland* instructs, it is extremely difficult to make out an IAC claim challenging a tactical or strategic decision on how best to pursue a defense.

**MEMORANDUM DECISION AND ORDER ON REMAND - 27**

*Strickland*, 466 U.S. 690-91. Indeed, the claims identified in ¶¶ 100(b), (d), (j), (*o*)(iii), and (*o*)(iv)—which challenge the failure of counsel to adequately investigate and present certain mitigating evidence in the first place—were stronger and had a better chance of success in state court than the claim that trial counsel's sentencing strategy was not coherent and was based on inattention to mitigation evidence in the defense's possession. It is unsurprising that PCR counsel chose to pursue those claims rather than the weaker claim set forth in ¶ 100(a).

Consideration of the standards applicable to the performance of trial and direct appeal counsel leads the Court to conclude that Creech's PCR counsel's choice of which sentencing IAC claims to assert and which to abandon, like a choice of which defense to present at trial or which issues to raise on appeal, was well within the bounds of reasonable professional judgment. *See Jones*, 463 U.S. at 752-53 ("There can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review. . . . A brief that raises every colorable issue runs the risk of burying good arguments . . . ."); *Correll v. Stewart*, 137 F.3d 1404, 1411 (9th Cir. 1998) (holding that counsel's failure to develop a mens rea defense was reasonable because such a defense "would have conflicted with the primary defense theory of misidentification"); *Turk v. White*, 116 F.3d, 1264, 1267 (9th Cir. 1997) (counsel's selection of self-defense theory was reasonable and obviated his need to investigate defendant's claim of incompetency). PCR counsel's decision to focus on the failure-to-investigate-and-present claims set forth in ¶¶ 100(b), (d), (j), (*o*)(iii), and

**MEMORANDUM DECISION AND ORDER ON REMAND - 28**

(*o*)(iv), rather than raise a *Strickland* challenge to the tactical way in which counsel chose to present evidence at the 1995 resentencing as set forth in ¶ 100(a), did not constitute deficient performance.

Moreover, the Court need not rest its *Martinez* decision on PCR counsel's performance alone, because Creech has shown no prejudice. As already noted, Claim 4, ¶ 100(a)—which asserts that Creech's counsel failed "to prepare, develop, and present a coherent sentencing strategy"—is not a challenge to the type of mitigation evidence that counsel presented, or failed to present, at the 1995 resentencing hearing. (Dkt. 131 at 24.) Instead, it is a challenge to the *manner* in which counsel presented mitigating evidence, a much weaker claim. Therefore, under *Strickland*, Creech's PCR counsel "remain[ed] above an objective standard of competence (prong one) and . . . caused [Creech] no prejudice (prong two) for the same reason—because [PCR counsel] declined to raise a weak issue." *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989). Even assuming that Creech's PCR counsel performed deficiently in failing to pursue Claim 4, ¶ 100(a), Creech has not demonstrated a reasonable probability that, had PCR counsel pursued a claim challenging trial's strategic decision on how to present mitigating evidence at sentencing, Creech would have succeeded in the initial postconviction proceeding and would have received another resentencing hearing.

Therefore, because Creech has not satisfied either *Strickland* prong with respect to his PCR's counsel's failure to fairly present Claim 4, subparagraph 100(a) to the state courts, Creech has not satisfied the second prong of *Martinez*.[10]

### B.    Claim 4, ¶¶ 100(b), (d), (j), (o)(iii), and (o)(iv): IATC Sub-Claims That the State Courts (and this Court) Adjudicated on the Merits

Subparagraphs 100(b), (d), (j), (*o*)(iii), and (*o*)(iv) of Claim 4 assert that trial counsel failed to adequately investigate and present mitigation evidence at sentencing with respect to family mental health issues (particularly Creech's mother's and daughter's mental illnesses), serious head injuries, organic brain damage, psychosis, and mental impairment. (Dkt. 131 at 24-27.) The state courts considered similar claims on the merits. Therefore, because the *Martinez* exception does not apply to IAC claims that were adjudicated on the merits in state court, the Court must now determine whether Claim 4, ¶¶ 100(b), (d), (j), (*o*)(iii), and (*o*)(iv) are the same claims as those previously decided by the Idaho state courts.

In *Dickens v. Ryan*, the Ninth Circuit held that *Martinez* can apply not only to IAC claims never adjudicated in state court, but also to IAC claims that *were* adjudicated on the merits, but were adjudicated on an inadequate record as a result of PCR counsel's ineffectiveness. 740 F.3d at 1319-20. In state court, Dickens had presented a conclusory or "naked" *Strickland* claim without sufficient factual support—the claim asserted only that "sentencing counsel did not effectively evaluate whether Dickens suffered from any

---

[10]    For this reason, the Court need not address whether Claim 4, ¶ 100(a) is substantial under the first prong of *Martinez*.

medical or mental impairment." *Id.* at 1319 (internal quotation marks and alteration omitted). In his federal petition, Dickens "substantially improved" the "evidentiary posture" of this claim by asserting that his attorney failed to discover that Dickens suffered from Fetal Alcohol Syndrome (FAS) and organic brain damage. *Id.*

Having asserted only the fundamentally-altered claim in his federal petition, Dickens was faced with a motion to dismiss on grounds of procedural default. The federal district court granted the motion to dismiss, and on appeal Dickens asserted that *Martinez* provided him with a new path for his procedurally defaulted claim to be heard. The *Dickens* court concluded that, notwithstanding the fact that the Arizona courts had adjudicated the original, inadequately-raised claim on the merits, Dickens could proceed to a *Martinez* hearing on the claim that Dickens's trial counsel was ineffective at sentencing for failing to raise the FAS and organic brain damage facts as a defense, because it was a "fundamentally altered" claim that was different from the claim that had been decided on the merits. *Id.* at 1319-20. *Dickens* further instructed that § 2254(e)(2) did not bar the federal court from hearing new evidence in a *Martinez* hearing. *Id.* at 1321-22.

Pursuant to *Dickens*, this Court may consider whether *Martinez* applies to Claim 4, subparagraphs 100(b), (d), (j), (*o*)(iii), and (*o*)(iv)—claims that Creech's trial counsel failed to adequately investigate and present mitigation evidence at sentencing with respect to family mental health issues (in particular the mental illness of Creech's mother and daughter), serious head injuries, organic brain damage, psychosis, and mental

impairment—only if those claims are fundamentally altered such that they constitute new claims not previously decided on the merits in state court.

A claim is considered fundamentally altered if the claim is now in a "significantly different and stronger evidentiary posture" than it was when the state courts considered the merits of the original claim. *Id.* To determine whether ¶¶ 100(b), (d), (j), (*o*)(iii), and (*o*)(iv) are fundamentally altered, the Court must compare the mitigation evidence presented in the state courts with the mitigation evidence Creech has now brought forward in this Court.

      i.    <u>Mitigation evidence previously presented in state court</u>

      a)    *1982 sentencing hearing*

The Court has previously described the evidence submitted by defense counsel at the 1982 sentencing hearing:

> Kehne offered the testimony of three witnesses in mitigation of punishment: Creech, a jailor, and a psychologist, Dr. John Stoner. (State's Lodging B-5, pp. 201-43.) Dr. Stoner testified that Creech had an antisocial personality, meaning that he tended to be impulsive, lacked empathy, and did not learn from punishment. (State's Lodging B-5, p. 210.) Dr. Stoner agreed that this type of disorder was a type of "learning deficit" that was probably developed in childhood. (State's Lodging B-5, p. 212.) Dr. Stoner also claimed that Creech suffered from a shizotypal personality, which is manifested in withdrawal, isolation, and occasionally bizarre thinking. (State's Lodging B-5, p. 213.)

(Dkt. 279 at 22-23.) Dr. Stoner also testified that he believed Creech suffered from some type of organic brain disorder. (State's Lodging B-5 at 226-27.)

**MEMORANDUM DECISION AND ORDER ON REMAND - 32**

b)      *1995 resentencing hearing*

The defense called three witnesses in mitigation at the 1995 resentencing hearing. First, Creech's brother-in-law, Michael Plageman, testified. (State's Lodging H-36 at 135.) Michael stated that Creech created artwork and poetry for family members, and that of all of Michael's brothers-in-law, Creech was the most amiable. (*Id.* at 137-39.)

Virginia Plageman, Michael Plageman's wife and Creech's sister, also testified on Creech's behalf at the resentencing hearing. Virginia testified that the family had a history of depression, "especially on [her] mother's side." (*Id.* at 144.) She stated that the family was "quick-tempered" and jealous and that "there's definitely some disorder within the family." (*Id.* at 148-49.) According to Virginia, Creech's mother "just left society" and became "antisocial" after Creech's younger brother died at the age of 13 months. (*Id.* at 154-55.) Virginia stated that all of the children, including Creech, had been "verbally and physically abused." (*Id.* at 156.)

Virginia also testified that Creech took a serious fall down a flight of stairs when he was five or six years old. Creech was taken to the hospital, and hospital records show that he sustained a concussion, but Creech's mother later took him out of the hospital against medical advice. (*Id.* at 161-62.) Creech's behavior changed after the fall, and he had a "hard time making decisions, and knowing, really, right from wrong." (*Id.* at 167.) He began stealing and running away from home, and was in juvenile detention by the age of 11 or 12. (*Id.* at 166.)

**MEMORANDUM DECISION AND ORDER ON REMAND - 33**

Virginia stated that Creech was a talented poet and singer, that he had begun to change as a result of his incarceration, and that Creech's new wife had been very encouraging and had helped Creech "tremendously." (*Id*. at 174.) Creech had become "more settled, more mellow, more sensible, more understanding," (*Id*. at 171.) Virginia testified that Creech was not the same person that he was when he murdered Jensen and that he had "more kindness and love in his heart." (*Id*. at 173.)

The final witness for the defense at the resentencing hearing was psychological expert Dr. Steven Thomas Brown. Dr. Brown's report on his evaluation of Creech was entered into evidence. (*See* Dkt. 309, Att. 1.)

Dr. Brown also reviewed records from a psychiatric evaluation of Creech conducted at the prison in 1974. The doctor evaluating Creech in 1974 diagnosed him with antisocial personality disorder and noted that Creech also showed some signs of depression. (State's Lodging H-36 at 188-89.) Other records indicated to Dr. Brown that Creech had a "very disturbed background, [and] he had a primitive personality." (*Id*. at 189.) Dr. Brown also noted that Dr. Stoner had determined Creech might have a brain disorder. Dr. Brown considered Creech's childhood head injuries as well as the fact that Creech's two brothers had also been convicted of homicide. (*Id*. at 190-93.)

Consistent with other doctors who had examined Creech, Dr. Brown diagnosed Creech with antisocial personality disorder. Dr. Brown described Creech as "a classic psychopath" and discussed how recent scientific literature supported an understanding that psychopathy was related to "some biological disturbance." (*Id*. at 197-98.) Dr.

**MEMORANDUM DECISION AND ORDER ON REMAND - 34**

Brown stated several times that Creech "probably" was biologically predisposed to psychopathy. (*Id*. at 276, 277, 288.) Dr. Brown pointed out that although a genetic predisposition to psychopathy "in no way . . . determine[s] the course of [a person's] life," Creech's genetics and biology constituted "a [nontrivial] contribution over which Mr. Creech had no control." (*Id*. at 217.) Dr. Brown also testified that Creech had undergone a "sharp reduction" in antisocial behavior in the years since he murdered David Jensen. (*Id*. at 278.)

c)   *Postconviction evidentiary hearing*

Mitigation evidence presented by Creech during the evidentiary hearing on his state postconviction petition included the following:

Creech's ex-wife Emma testified that Creech was sexually abused as a child by his aunt and uncle and that Creech's family "all knew it" yet did nothing to stop it. (State's Lodging I-39 at 58-62.) Emma also testified that she had informed Rolf Kehne, Creech's trial attorney, of the abuse prior to the resentencing hearing. Emma stated that Shelley Creech, Creech's daughter, also had mental health problems and had been hospitalized several times for mental illness. (*Id*. at 66-68, 74-75.) Emma stated that she had two daughters, but that only Shelley "has the same thing [Creech] has." (*Id*. at 77.)

Shelley Creech then took the stand. She confirmed that she had been hospitalized numerous times for multiple mental illnesses, including schizophrenia, depression, borderline personality disorder, and "some other things" she could not recall. (*Id*. at 82.) She testified that Creech had written her regularly from prison, that Creech had tried to

maintain a father-daughter relationship despite being incarcerated for much of her life, and that it would be difficult for her to share some of the things that had happened to her with family members other than Creech. (*Id.* at 88.) Shelley had also dealt with serious drug problems, going all the way back to when she was 5 years old. (*Id.* at 93.) She testified that Kehne did not speak to her prior to Creech's resentencing. (*Id.* at 80.)

Former Ada County Sheriff Chuck Palmer testified that several years before Jensen's murder, when Creech was jailed on two other murder charges, Creech suffered a seizure and tore up his cell. Palmer was able to "calm down" these problems and stated that Creech was cooperative and respected his authority. (*Id.* at 103-05.)

John Adams, Kehne's co-counsel at the resentencing hearing, testified as "both a factual witness and an expert on death penalty defense." (State's Lodging I-38 at 201.) Adams stated that he and Kehne were not prepared for the 1995 resentencing, based on both time and financial restraints. Adams testified that he and Kehne made several mistakes, such as Kehne's failure to withdraw as Creech's counsel so he could testify as a witness with respect to a motion to withdraw Creech's guilty plea, their failure to "give [Creech's] case the attention, the time, the work that [they] should have done," their failure to "get the background on [the victim] . . . to do something about His Honor's findings" with respect to whether Jensen was a vulnerable inmate, and their failure to challenge the validity of two of Creech's previous murder convictions. (State's Lodging I-39 at 185-98, 216-18.)

**MEMORANDUM DECISION AND ORDER ON REMAND - 36**

According to Adams, he and Kehne retained a mitigation investigator "extremely late in the proceedings," and they "didn't have an adequate investigation." (*Id*. at 201.) Adams believed the mitigation investigation was inadequate in part because he and Kehne did not bring to the sentencing court's attention Creech's sexual abuse, Creech's daughter's schizophrenia, or the issue of whether prosecutors in large, well-funded counties, like Ada County, were more likely to seek the death penalty than those in smaller counties. (*Id*. at 207-09.) Adams testified extensively as to the other death penalty cases that he and Kehne were working on at the time of Creech's resentencing, stating that they gave those cases priority over Creech's. (*Id*. at 185-97, 229-31.)

Kehne testified at the postconviction evidentiary hearing that he did not present sufficient mitigating evidence in Creech's 1995 resentencing proceedings. As accurately summarized by the state court when it denied the postconviction petition,

> Kehne stated he should have addressed Creech's childhood as well as his family history of mental illness. Kehne did not know of the sexual molestation of Creech. Although he was aware of the family's history of mental illness, the daughter's mental health history is significant and should have been brought out. He knew he needed to attack the aggravating evidence and knew that the earlier presentencing investigation report would be used by the court. He didn't try to limit aggravating testimony to live witnesses; didn't try to collaterally attack any of the earlier murder convictions; didn't attack other unadjudicated murders; didn't try to withdraw Creech's guilty plea, should have tried to impugn Jensen as a victim, but the records received were edited; and did not advise Creech to remain silent and that counsel could be present at mental health interviews.

(State's Lodging I-38 at 202-03.)

**MEMORANDUM DECISION AND ORDER ON REMAND - 37**

Glenn Elam, the investigator assigned to Creech's postconviction case by the public defender's office, testified that he was not able to do everything he should have done to prepare the postconviction case. (State's Lodging I-39 at 348, 366-76.) Elam clarified that he did not work on Creech's case before or during the 1995 resentencing proceedings. (*Id.* at 351.) Elam testified that, in preparation for resentencing, "a mitigation expert should have been hired, a neurological report regarding Creech's childhood head injury should have been created, Creech's juvenile records and school records should have been gathered; and [the defense] should have focused upon the sexual abuse aspect of Creech's early years." (State's Lodging I-38 at 203 (state district court accurately describing Elam's testimony).)

Former Ada County Prosecutor Jim Harris, who prosecuted Creech for Jensen's murder, testified that he did not recall whether Kehne had ever contacted him concerning the decision to seek the death penalty against Creech. (State's Lodging I-39 at 416.) Harris stated that "to the best of [his] recollection, financial considerations were not a factor" in the decision to seek the death penalty. (*Id.* at 417.)

Creech's final witness at the postconviction evidentiary hearing was Amil Myshin, who testified as an expert in death-penalty litigation. Myshin stated that "an attorney who may also be a fact witness should not continue to represent a defendant" and that Creech's attorneys should have challenged two of Creech's previous murder convictions and the murders that Creech confessed to committing but for which he had not been tried. "At the minimum, a mitigation expert should have been hired and Creech's family history

**MEMORANDUM DECISION AND ORDER ON REMAND - 38**

of mental illness, sexual abuse and head injury should have been explored and developed. The psychiatric testimony on Creech should have been scrutinized and every effort made to reduce the effect of the testimony." (State's Lodging I-38 at 204 (state court's accurate summary of Myshin's testimony).)

      ii.      <u>Evidence and offers of proof presented to this Court, but not to the state courts</u>

The Court now recounts the evidence and offers of proof regarding mitigation that Creech presented in this federal habeas action but did not present to the state courts. Specifically, Creech has asserted that additional brain testing "would have revealed bilateral brain damage that affected Creech's insight, judgment and capacity to exercise social inhibitions." (Dkt. 245 at 25.)

With his merits briefing, Petitioner made the following offer of proof to support this contention:

1.      Neurological testing performed in 2005 and available in 1995 would have revealed damage to Mr. Creech's frontal lobes. An examination done near in time to the resentencing proceedings would have revealed bilateral brain damage with the right side more damaged than the left. A major dysfunction in the circuits that subserve the frontal lobes would have been discovered.

2.      This neurological damage would most likely influence Mr. Creech's behavior and thought by reducing his judgment, insight and capacity to reflect on his actions. His ability to plan is defective because of his

neurological damage.[11] He demonstrates poor attention and has evidence of attention deficit.

3.      In addition to the neurological findings, testimony regarding the existing medical and social records would indicate that Mr. Creech had never been examined by a neurologist until 2005.

4.      A qualified mental health professional would, based upon the records reviewed by Dr. Brown or available to counsel in 1995, have identified specific areas of additional investigation: investigation of evidence of physical and sexual child abuse to Mr. Creech based upon records of hospital admissions and discharges against medical advise [sic]; investigations into the parental and ancestral incidents of mental illness based upon interviews with the client; confirmation of mental illness in Mr. Creech based upon evidence of dissociation and personality disorders; investigation of childhood and adolescent upbringing through interviews with extended and immediate family members; investigation into Mr. Creech's inability to conform to societal expectations through review of military, educational and social records.

5.      A mitigation investigation specialist would have testified that members of Mr. Creech's family, including siblings, in-laws, aunts and uncles, wives

---

[11]      The state court factual findings fail to show that Creech's ability to plan is defective. Creech specifically planned Jensen's murder, to the extent that (1) he made two different deadly weapons, so that (2) other inmates would give the weapons to Jensen, so that (3) Creech could take the weapons away and use them to kill Jensen, so that (4) it would appear that Creech killed Jensen in self-defense. Creech's capacity to make plans is not deficient—he simply makes malevolent plans.

**MEMORANDUM DECISION AND ORDER ON REMAND - 40**

and former girlfriends would have provided details into the Creech family
dynamics and observations of behavior consistent with mental illness.
Information about sexual abuse in the family would also have been
provided. Family members would have testified about the physical and
emotional abuse to the Creech children and abuse between the Creech
parents. Information about Mr. Creech's involvement in auto accidents
would have been revealed.

6.   Records would have revealed limited coping skills by Mr. Creech based
upon educational, military and correctional documents. Military records
would have documented that Mr. Creech performed poorly in the military
and was not able to meet the military's expectation resulting in discharge
from the service.

(Dkt. 245-2 at 2-3.)

Creech had also previously submitted evidence to this Court along with his motion
for an evidentiary hearing on the merits of some of his habeas claims, including ¶¶ 100(b)
and (d). (*See* Dkt. 211, 212, 228.) This evidence includes declarations from Creech's
sister and brother. Virginia Plageman—who testified at the 1995 resentencing—
expounded upon her testimony and added more detail as to (1) Creech's "early signs of
mental illness," (2) his mother's instability, her non-nurturing and sometimes violent
behavior, and her tendency to "[run] around with men," and (3) other family members'
mental health issues and alcoholism. (Dkt. 212-1 at 2-3.) Virginia and her brother, Billy

**MEMORANDUM DECISION AND ORDER ON REMAND - 41**

Creech, both described an incident where their aunt tried to kill their mother. Billy also stated that he and Virginia "knew something was very wrong with [Creech] from a young age" and "tried to talk to [their] mother about getting [him] some psychiatric help" as a child, but that their mother "wouldn't hear of it." (*Id.* at 6.)

The evidence Creech submitted with his motion for an evidentiary hearing on the merits also included a report of Creech's social history prepared by Joyce Naffziger, a mitigation specialist. (Dkt. 228-1 at 33-55.) The report explained that Creech's early developmental years were rife with "[h]ead injuries, dysfunctional parents, a family history of addiction and mental health problems, and an unstable and often violent environment." (*Id.* at 33.) As support for this statement, Naffziger described various occurrences in Creech's past, including his physical and potentially sexual abuse at the Ohio State Reformatory, his self-mutilation and suicide attempts, and his tendency to start fires in family residences. (*Id.* at 46-51.)

Creech also submitted neuropsychological evaluations of Creech conducted by Dr. Michael M. Gelbort and Dr. Jonathon H. Pincus. Both determined that Creech might suffer from a brain disorder that limited his ability to react logically or to control his impulses. (*Id.* at 56-62.)

    iii.  <u>The Sub-Claims Set Forth in Claim 4, ¶¶ 100(b), (d), (j), (*o*)(iii), and (*o*)(iv) Are Not Fundamentally Altered and, Therefore, Are Not Subject to *Martinez*</u>

For the reasons that follow, the Court concludes that the claims presented in subparagraphs 100(b), (d), (j), (*o*)(iii), and (*o*)(iv) of Claim 4 are not fundamentally altered from those adjudicated on the merits in the Idaho Supreme Court (and by this

**MEMORANDUM DECISION AND ORDER ON REMAND - 42**

Court). Therefore, these claims are not procedurally defaulted, and *Martinez v. Ryan* does not apply.

As an initial matter, Creech argues that this Court did not previously consider the evidence and offers of proof he provided with his motion for an evidentiary hearing and his merits briefing. (Dkt. 308 at 17; Dkt. 318 at 20.) Creech is mistaken.

This Court did, in fact, consider Creech's previous offers of proof and the evidence he provided to support his mitigation-based IAC sub-claims set forth in ¶¶ 100(b), (d), (j), (*o*)(iii), and (*o*)(iv). Creech is correct that the Court reaffirmed its previous decision that the evidence was not provided to the state courts, that Creech had a full and fair opportunity to develop the evidence, and that an evidentiary hearing in federal court was thus prohibited by 28 U.S.C. § 2254(e)(2).[12]

Keeping in mind the severity of the ultimate punishment, however, the Court reviewed Creech's evidentiary submissions anyway, determining that "nothing contained therein tend[s] to show that habeas relief would be warranted if the Court expanded the record or held an evidentiary hearing." (Dkt. 279 at 34.) Far from refusing to look at that evidence, the Court considered it and found that it would not have made a difference to the sentencing court. "A neurologist's opinion that Creech has brain damage may be more specific than Dr. Brown's testimony [at the 1995 resentencing hearing], but it would have provided only a modest counterweight to the heavy aggravating factors,

---

[12]     The Court issued its decision before the Supreme Court held, in *Pinholster*, that evidentiary hearings on federal habeas claims are barred not only if the requirements in § 2254(e)(2) are not met, but also if the claims were adjudicated on the merits by the state courts. 563 U.S. at 181 ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

**MEMORANDUM DECISION AND ORDER ON REMAND - 43**

which included Creech's extensive criminal history showing a predisposition to commit murder, and his decision to kill a weaker prison inmate over a petty dispute in an especially brutal manner." (*Id.* at 35.) Similarly, though the details of Creech's social history set forth in the Naffziger report were more specific than the evidence revealed at the sentencing and postconviction hearings, it would not have been remotely sufficient for the sentencing court to refrain from imposing the death penalty.

Because the Court, in its merits decision, reviewed and considered Creech's evidentiary submissions as to Claim 4, subparagraphs 100(b), (d), (j), (*o*)(iii), and (*o*)(iv), the only pieces of evidence that this Court had not considered when it denied these claims on the merits are Creech's current counsel's June 3, 2013 declaration, which primarily deals with the issue of whether Creech has an organic brain disorder, as well the documents attached thereto.

In her Declaration, Creech's current counsel states that she "consulted with a neuropsychologist licensed to practice in the state of Idaho to prepare the Supplemental Opening Brief addressing the application of *Martinez v. Ryan* to [Creech's] case." (Decl. of Teresa A. Hampton, Dkt. 309-1, at ¶3.) The neuropsychologist reviewed "available test results, medical and mental health history and notations from institutions, limited test raw data, and reports and records," and discussed with counsel "testimony and witness interviews detailing family history and witness testimony from Petitioner's state proceedings." (*Id.* at ¶5.) According to the Declaration, the consultation between counsel and the neuropsychologist resulted in a determination that Creech may suffer from an

**MEMORANDUM DECISION AND ORDER ON REMAND - 44**

organic brain disorder, such as a "disorder[] of the frontal-subcortical circuits" or "frontal

lobe dysfunction," which can cause "poor impulse control and emotional liability" and

"difficulties in cognitive, behavior and emotional response." (*Id.* at ¶¶18, 20.)

The Declaration describes the neuropsychological disorder of "disinhibition,"

which, among other things, can contribute to the following:

    a.    Disproportionate behavioral reactions based on
emotional responses to a given situation;

    b.    Impulsive behavioral reactions to needs (such as need
for attention, approval, esteem);

    c.    Disproportionate behavioral and emotional reactions to
perceived threats;

    d.    Inability to inhibit behavioral responses once the
behavior is started;

    e.    Inability to regulate emotional responses to a situation,
such as anxiety, anger or despair. The emotional
response is usually very extreme and intense; and

    f.    Inability to regulate, control or stop obsessive thoughts
that result in maladaptive emotional or behavioral
response.

(*Id.* ¶19.)

This offer of proof is comparable to the neuropsychological evaluations conducted

by Drs. Gelbort and Pincus, which the Court has already considered. Dr. Pincus

determined that Creech suffers from "bilateral brain damage." (Dkt. 228-1 at 62.) Dr.

Pincus stated that the "behavioral result" of this damage would be "to reduce [Creech's]

capacity to plan well. His insight, judgment, and capacity to exercise social inhibitions

**MEMORANDUM DECISION AND ORDER ON REMAND - 45**

would all be impaired. He would be impulsive. Combined with the mental symptoms that he has and had at the time of his sentencing trial, and the history of severe abuse, physical and sexual, that he suffered during childhood, the neurological damage would have been likely to have a malign significance with regard to his behavior." (*Id*.) Similarly, Dr. Gelbort determined that Creech's "deficits are indicative of minimal brain dysfunction, [and] appear to be long-standing in nature, and limit the patient's ability to think/behave in a logically reasonable and adaptive fashion." (*Id*. at 58.)

As the Court previously stated, "[m]uch of this information was already before the state courts, albeit in a less specific way, including evidence that Creech grew up in an abusive and dysfunctional household, that his mother and probably other relatives suffered from mental illness, that he injured his head in a childhood fall, and that he had cognitive, coping, and learning deficits." (Dkt. 279 at 34.) Over the course of the two sentencing hearings and the state postconviction proceedings, it had been well-established that Creech might, indeed, have some a biological or genetic component that contributed to his antisocial and violent behavior, that he suffered from a serious head injury as a child, that his family members struggled with mental illness, and that his childhood was traumatic, frightening, and violent, but the state courts were not persuaded that these mitigating factors outweighed the aggravating factors so as to justify a life sentence instead of the death penalty.

The documentary evidence attached to counsel's declaration is also duplicative of, or quite similar to, the evidence presented during the 1995 resentencing and/or Creech's

**MEMORANDUM DECISION AND ORDER ON REMAND - 46**

postconviction evidentiary hearing. Creech contends that, when considered together with the evidence described above, the following records place his mitigation-based IAC claims in a substantially better light: (1) medical records of Creech's mother Zolia (also known as Faye); (2) records of Creech's stay at Brown County Hospital for an "anxiety reaction"; (3) records of Creech's military history that indicate Creech had a "nervous condition since childhood"; and (4) medical records from Mercy Hospital regarding Creech's childhood fall, which show that Creech was conscious when he arrived at the hospital and that he suffered a cerebral concussion.[13] (Dkt. 309, Att. 4-7.)

The medical records of Creech's mother are not substantially more persuasive than the evidence—already considered by the state courts—that Creech's mother suffered from mental illness and was far from an ideal parent. Further, the Court has reviewed the attached records of Creech's anxiety reaction and subsequent hospital stay, his military records, and the medical records of Petitioner's childhood fall (and removal from the hospital against medical advice), and concludes that these records do very little to alter the evidentiary posture of the mitigation-based IATC claims that were adjudicated on the merits in state court.

Although the mitigation evidence Creech has submitted to this Court supports an inference that Creech might have a genetic or biological predisposition to violence, that he suffered a traumatic childhood, and that he has a family history of mental illness, the postconviction court already had such evidence before it. The evidence that Petitioner

---

[13]     The documents attached to counsel's Declaration also include Dr. Brown's psychological evaluation of Creech. (*See* Dkt. 309, Att. 1.) This report was admitted at Creech's 1995 resentencing hearing.

**MEMORANDUM DECISION AND ORDER ON REMAND - 47**

brings forward in this Court, although more specific, adds little substance to the evidence that the state courts considered when adjudicating Petitioner's mitigation-based IATC claims. The evidence submitted for the first time in this Court simply does not substantially improve the evidentiary posture of those claims. *See Dickens*, 740 F.3d at 1318. For these reasons, Claim 4, subparagraphs (b), (d), (j), (*o*)(iii), and (*o*)(iv) are not fundamentally altered, are not procedurally defaulted, and, therefore, are not subject to the exception established in *Martinez v. Ryan*.

## CONCLUSION

Subparagraphs 100(b), (d), (j), (*o*)(iii), and (*o*)(iv) of Claim 4 were adjudicated on the merits by the Idaho Supreme Court, and evidence submitted to this Court does not establish that these sub-claims are fundamentally altered. The only procedurally-defaulted IAC sub-claim that Creech places at issue is Claim 4, subparagraph 100(a): that counsel failed to prepare, develop, and follow a coherent sentencing strategy. Creech's other *Martinez* arguments have been forfeited or waived.

As to ¶ 100(a), Creech's PCR counsel performed reasonably and competently in not pursuing this claim during Creech's state postconviction proceedings. Further, even if Creech could show that his PCR counsel performed deficiently, Creech has not established a reasonable probability that, but for PCR counsel's alleged errors, the result of the state postconviction proceeding would have been different. *See Clabourne*, 745 F.3d at 377.

**MEMORANDUM DECISION AND ORDER ON REMAND - 48**

The entirety of the record reveals that Creech is a multiple murderer who has little to no regard for human life. Having been previously spared the death penalty, his sentence of life imprisonment did not deter him from viciously murdering a partially-disabled prisoner in a particularly horrific manner. This Court is convinced that there is nothing PCR counsel could have done in pursuing Claim 4, ¶ 100(a) that would have persuaded the state postconviction court to vacate Creech's death sentence and grant him another resentencing hearing.

For the foregoing reasons, *Martinez* does not apply to excuse the procedural default of Creech's IATC claims.

## CERTIFICATE OF APPEALABILITY

In the event that Creech files a timely notice of appeal, the Court has evaluated the issues decided on remand with respect to whether a certificate of appealability should issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. The Court previously granted a certificate of appealability with respect to its resolution of the merits of the non-defaulted aspects of Claims 2, 3, 4 (to the extent Creech alleges that he was deprived of his right to effective assistance of counsel at the 1995 resentencing proceeding), 25, and 27. (Dkt. 279 at 56.) The proceedings on remand have encompassed only the *Martinez* issue.

A certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This showing can be established by demonstrating that "reasonable jurists could debate

**MEMORANDUM DECISION AND ORDER ON REMAND - 49**

whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)).

The Court has concluded that Creech cannot, as a matter of law, satisfy the second prong of *Martinez* with respect to Claim 4, ¶ 100(a), which is the only procedurally-defaulted IATC sub-claim with respect to which Creech specifically asserts a *Martinez* argument. Having carefully considered the issue, the Court additionally finds that, because the evidence in mitigation is heavily and conclusively outweighed by the overwhelming evidence of the aggravating factors found by the trial court—including the horrific nature of Creech's crime and the fact that Creech is a multiple murderer who killed a disabled prisoner while serving a life sentence—reasonable jurists would agree that Creech's *Martinez* argument as to Claim 4, ¶ 100(a) is without merit, on the grounds that he cannot demonstrate deficient performance of PCR counsel or a reasonable probability of prejudice as a result of PCR counsel's representation.

The Court further concludes that reasonable jurists could not dispute that Creech has failed to specifically support a *Martinez* argument as to the sub-claims identified in Claim 4, ¶¶ 99(h) and (j); Claim 4, ¶¶ 100(e), (g), (h), (*i*), (m), (*o*)(i), (*o*)(ii), (*o*)(v), and (q); and Claim 30, and, therefore, that his *Martinez* arguments with respect to those claims have been forfeited or waived.

**MEMORANDUM DECISION AND ORDER ON REMAND - 50**

However, the Court concludes that reasonable jurists could potentially debate whether the sub-claims set forth in Claim 4, ¶ 100(b), (d), (j), (*o*)(iii), and (*o*)(iv) are fundamentally altered from the claims decided on the merits in state court, for purposes of a *Martinez* analysis. Therefore, the Court will grant a certificate of appealability with respect to this issue.

## ORDER

**IT IS HEREBY ORDERED:**

1.   Respondent Al Ramirez is SUBSTITUTED for his predecessor as Warden of the Idaho Maximum Security Institution. *See* Fed. R. Civ. P. 25(d).

2.   The Court reaffirms its previous dismissal of Claim 4, ¶ 100(a) as procedurally defaulted. Because Creech cannot satisfy the second prong of *Martinez v. Ryan*, that exception does not apply to excuse the procedural default of ¶ 100(a) of Claim 4.

3.   The sub-claims set forth in Claim 4, ¶¶ 100(b), (d), (j), (*o*)(iii), and (*o*)(iv) are not fundamentally altered from the claims adjudicated on the merits in state court and, therefore, are not subject to the *Martinez* exception.

4.   The Court reaffirms its previous grant of a certificate of appealability with respect to its resolution of the merits of the non-defaulted aspects of Claims 2, 3, 4 (to the extent Creech alleges that he was deprived of his right to the effective assistance of counsel at the 1995 resentencing proceeding), 25, and 27. The Court now grants an additional certificate of appealability on

Claim 4, but *only* with respect to whether the sub-claims set forth in subparagraphs 100(b), (d), (j), (*o*)(iii), and (*o*)(iv) are fundamentally altered from the original claims decided on the merits by the Idaho state courts.

5.     The Court will allow Petitioner to file a motion to reconsider **within 28 days**. If no such motion is filed, a new judgment will be entered.

DATED: January 29, 2016

B. Lynn Winmill
Chief Judge
United States District Court